**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| JENAY CRAIG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | 1:06-cv-954-SEB-DML |
| | ) | |
| PEPPERIDGE FARM, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY DISCUSSING MOTIONS FOR SUMMARY JUDGMENT**

This case was originally brought by twelve Pepperidge Farm, Incorporated ("Pepperidge Farm" or "Bakery") distributors. Only three of these distributors, Jenay Craig, Randy Patterson, and Dennis McGuire (collectively "the plaintiffs"), still have claims pending in this action. Defendant Pepperidge Farm and each pro-se plaintiff seek resolution of these claims through summary judgment. The plaintiffs each filed a Motion for Partial Summary Judgment on May 14, 2008 (dkts 169, 170, and 171, respectively) and Pepperidge Farm filed its Motion for Summary Judgment (dkt 172) on the same day. These motions are now fully briefed. This Entry addresses all pending motions.

### I. Summary of Claims

The plaintiffs, proceeding pro se, allege claims for breach of contract (Count IV), for tortious interference with business relationships (Count VII), and tortious interference with prospective business advantage (Count VIII). All other claims have been resolved by prior orders.

The plaintiffs contend that Pepperidge Farm has arbitrarily and unilaterally made changes to their consignment agreements over time for its own benefit, and that this has resulted in the following breaches of contract:

1. Pepperidge Farm unilaterally determines the amount of product inventory that certain retail outlets in the plaintiffs' territories receive and adds that inventory to the plaintiffs' product orders without the knowledge or consent of the plaintiffs (referred to as "plussing up" plaintiffs' orders);

2. Pepperidge Farm terminated plaintiffs' right to distribute products to certain convenience stores located in their territories and is not paying plaintiffs a 20% commission on deliveries of product to these accounts;

3. Pepperidge Farm "undersells" the plaintiffs in their territories by selling product to "stores such as Walgreens and CVS at such low prices that Walgreens and CVS can sell those products at retail for lower prices than [plaintiffs] can sell the same products to [their] customers at wholesale";

4. Pepperidge Farm charges a "pallet fee" to the plaintiffs for product that it delivers to the warehouses of customers that also receive product from the plaintiffs via direct store delivery; and

5. Pepperidge Farm charges the plaintiffs for the amount of overcode or expired product returned to it in excess of a "thrift cap."

The plaintiffs also claim that Pepperidge Farm tortiously interfered with actual and prospective business relationships through some of these same practices, namely, by delivering product directly to certain stores in their respective territories, and denying plaintiffs a 20% commission on products sold by Pepperidge Farm to stores in their territory which decreased their route's value.

## II. Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c) of the *Federal Rules of Civil Procedure*. A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Springer v. Durflinger,* 518 F.3d 479, 483 (7th Cir. 2008)(quoting *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir. 2007), and *Brummett v. Sinclair Broad. Group, Inc.,* 414 F.3d 686, 692 (7th Cir. 2005)). When, as in this case, the parties have filed cross-motions for summary judgment, "'we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made.'" *Cavin v. Home Loan Center, Inc.,* 531 F.3d 526, 528-29 (7th Cir. 2008) (quoting *Premcor USA v. Am. Home Assurance Co.,* 400 F.3d 523, 526 (7th Cir. 2005)).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2)."'[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th

Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983))."The nonmovant will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion." *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002) (internal quotation and citation omitted). When the moving party has met the standard of Rule 56, summary judgment is mandatory. See *Celotex Corp.,* 477 at 322-23; *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

### III. Material Facts Not in Dispute

The following facts are undisputed for purposes of the cross-motions for summary judgment.

1.     **Consignment Agreement.**[1]  Each of the plaintiffs signed an individual Consignment Agreement consisting of various contemporaneously executed documents that set forth the terms and conditions pursuant to which the plaintiffs may distribute certain Pepperidge Farm products. Patterson paid $110,000.00, Craig paid $90,000.00 and McGuire paid $50,000.00. In return, the Consignment Agreement gives each plaintiff the right to distribute Consigned Product in a particular Territory or Sales Area (described in Schedule A of the Consignment Agreement).

2.     **Exclusiveness of Distributorship.** Paragraph 1 of the Consignment Agreement provides:

> Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3(b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery. The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

---

[1] Each plaintiff's Consignment Agreement is unique, but there do not appear to be any material differences between agreements which would affect the outcome of these motions for summary judgment.

3.     **Quantities Consigned.** Paragraph 2 of the Consignment Agreement provides that the Bakery will consign and deliver, and Consignee will accept "sufficient quantities of Consigned Products to maintain at all times an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable." All Consigned Products are the "sole and exclusive property of Bakery" until delivered by Consignee to a purchaser.

4.     **Proceeds and Records of Sale**. Paragraph 3 of the Consignment Agreement provides as follows:

- Chain stores and military commissaries which request direct billing from the Bakery are direct customers of the Bakery and the Bakery assumes all credit risks with respect to these customers.
- Consignee "shall have the exclusive right to perform the service of delivery of Consigned Products of such customers of Bakery and Bakery shall not effect such delivery except through Consignee. . . ."
- Bakery may extend credit to Consignee for products to be sold to retail stores on credit extended by Consignee. Any credit extended by Consignee shall be at Consignee's risk.

5.     **Cash Accounts.** The plaintiffs can deliver Consigned Product to "cash accounts" at such prices as the plaintiffs choose. These "cash accounts" are not direct customers of Pepperidge Farm. The plaintiffs have very few cash account customers. Neither McMillen nor Craig delivered any Pepperidge Farm product to cash stores within the last fifty-two weeks. In the most recent fifty-two week period, McGuire submitted four cash tickets to undisclosed cash stores, and Patterson submitted three cash tickets to undisclosed cash stores. The plaintiffs do not claim that Pepperidge Farm has interfered with any cash account customers.

6.     **Chain Stores.** All Chains (persons or entities that own or operate three or more retail stores), that request direct billing by Pepperidge Farm are direct customers of Pepperidge Farm. For such customers, the plaintiffs have the right to solicit sales and to deliver product to them on Pepperidge Farm's behalf at Bulletin Prices, *i.e.*, prices charged by Pepperidge Farm. Pepperidge Farm assumes all credit risks with respect to Chain customers that receive direct billing. The plaintiffs are paid a commission of 20% on the wholesale price (*i.e.*, before any discount to the customer from Bulletin Prices) of all Pepperidge Farm product delivered to Chain stores.

7.     **Warehouses.** The plaintiffs are permitted to deliver Consigned Product to a Chain's retail stores, but are prohibited from making deliveries to any central or district warehouse or to a Chain at any location other than directly to a store within a plaintiff's territory. See ¶9 of Agreement. Under the Consignment Agreement, a distributor may not (without special authorization) deliver product to a Chain's warehouse. When, despite the best efforts of both Pepperidge Farm and the plaintiffs, a Chain refuses delivery of Pepperidge Farm product directly to its stores (Direct Store Delivery, or "DSD"), and demands warehouse

delivery, Pepperidge has the right in its discretion, to deliver Consigned Product directly to the Chain via warehouse delivery for Pepperidge Farm's own account. Pepperidge Farm does not deliver product directly to the stores of any mass merchandise, grocery, club, convenience or drug Chain customers. Rather, Pepperidge Farm delivers to the warehouse designated by the Chain. The Chain customer then arranges the timing and amount of product delivered to its individual retail stores.

8.   **Convenience and Drug Chains.** Pepperidge Farm's Director of Distributor Development testified that "unlike grocery and mass merchandise Chains that distributors service, distributors have not satisfactorily serviced convenience and drug Chains, if they serviced them at all." Accordingly, Pepperidge Farm has elected not to pay a 20% commission on deliveries to convenience and drug Chains, but offered an alternative to its distributors called the "Convenient Availability Addendum." Many distributors accepted this arrangement, but the plaintiffs rejected it.  The Consignment Agreement provides that "[i]f Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee."  See ¶ 7 of Agreement.

9.   **Temporary Sales Programs.** From time to time, and in connection with temporary sales programs under paragraph 3 of the plaintiffs' Consignment Agreements, Pepperidge Farm delivers product via pallet to central warehouse facilities ("supplemental deliveries") maintained by certain mass merchandise and grocery store customers. The customers in turn deliver the product to their stores. This allows the Chain to make sure that all its stores carry sufficient product on promotion and have the sale product at the beginning and throughout the promotion period. Pepperidge Farm's Chain customers request supplemental deliveries, decide which of their retail stores receive the product, when the retail stores receive the product, and when and how much of the product they deliver to their retail stores.

10.   **Club Stores.**  Several years ago, Club Stores, such as BJs, Costco, and Sam's, informed Pepperidge Farm that they would no longer accept DSD from distributors, but would require that all deliveries of Pepperidge Farm product be made to their central warehouses. These Club stores require that Pepperidge Farm deliver all biscuit product on pallets to their central warehouses. The customers in turn distribute the product to their stores, which are in territories of different Pepperidge Farm distributors. Under the Consignment Agreement, Pepperidge Farm is not required to pay distributors any commission for product delivered to the central or district warehouses belonging to Club stores. Nevertheless, under its Pallet Program (discussed below), Pepperidge Farm made a business decision to pay its distributors 20% less a pallet assessment for product that the

5

Club delivers to its stores in a distributor's territory. This was done because Pepperidge Farm recognized the significant source of commissions that Club stores provide and that eliminating Club store commissions could harm its distributor network.

11.     **Solicitation of Retail Stores.**  The plaintiffs have the obligation to use his/her best efforts to realize the full sales potential of the Territory for Consigned Products: This includes, actively soliciting all retail stores in their Territories whose accounts can be profitably handled.

   a.   **Craig** identified the convenience and drug stores in her territory. She either never delivered Pepperidge Farm product, never made a sales call on any of them, or has not done so in "several years" – and then only in connection with promotions.

   b.   **Patterson** identified the convenience and drug stores in his territory. Patterson never delivered any Pepperidge Farm product to Walgreens. He called on Walgreens stores and claims he was told that they would not authorize him to deliver product to the stores. He made one call to the CVS stores in his territory and claims he was told they would not accept service from him. Patterson never called on the Speedway stores in his territory before they began to receive product warehouse delivered by Pepperidge Farm. He made a couple of calls since then and claims he was told that Speedway would not accept direct store delivery. Patterson made one call on Toys-R-Us a few years ago and claims he was told that they would not accept direct store delivery. Patterson never delivered product to any of the other convenience Chain stores in his territory and has not tried to do so.

   c.   **McGuire** identified the convenience and drug stores in his territory. McGuire never delivered any Pepperidge Farm product to any Walgreens store. He called on the Walgreens stores in his territory and claims he was told that they would not accept direct store delivery. McGuire delivered product for a time to BP Connect until he claims he was told that the store would no longer accept direct store delivery. He never delivered product to Deal$. He made one sales call on Deal$ and claims he was told that all product came through the Chain's warehouse. McGuire never delivered product to Dollar General. He made a telephone call to explore delivery and claims he was told the stores would not accept direct store delivery. McGuire never delivered product to any of the other convenience Chain stores in his territory and has not tried to do so.

12.     **Direct Store Delivery.** Pepperidge Farm's preferred method of doing business is direct store delivery ("DSD") through its distributors, such as the plaintiffs. Between 80 and 85 percent of Pepperidge Farm's biscuit sales are delivered via DSD. Pepperidge Farm

would prefer not to have to make pallet deliveries of Consigned Product to drug and convenience customers' central warehouses. Pepperidge Farm believes that DSD is the best way to ensure proper merchandising and rotation for its short shelf life products. However, primarily because of inconsistent or nonexistent DSD across the Chain, or their refusal to accept DSD service because they require warehouse deliveries, some customers in the drug and convenience categories with retail stores in the plaintiffs' territories have refused to accept product delivered by distributors.

13.     **Customer Demands.** Pepperidge Farm has used its best efforts to attempt to persuade various convenience store and drug store Chain customers to continue to accept DSD to their retail stores, including: 7-Eleven, Loaf N' Jug, Stewart Shops, Deal$, Menard's Hardware, HMS Host, Pay N' Save, Allsup's, Toys 'R Us, Babies 'R Us, Circle K, Sheetz, Kwik Trip, Rich Oil, Speedway, SuperAmerica, Save-A-Lot, Affiliated Foods Midwest, Hudson News, Duckwall- Alco, BP Amoco, Casey's General Stores, Hess, Valero, Exxon Mobil, Wawa, Walgreens, Rite Aid, CVS, Pilot, Fresh & Easy, W.H. Braum and Family Express. Despite Pepperidge Farm's best efforts to preserve DSD, all of these customers have demanded deliveries via central or district warehouses. As a result, Pepperidge Farm has commenced warehouse deliveries to some, but not all, of these customers' central or district warehouses. Customers demand central warehouse delivery for a variety of reasons, including: (1) to achieve uniform service levels; (2) to eliminate problems associated with non-existent, poor, or infrequent delivery service; (3) to avoid having Chain store customers compete with delivery trucks for parking spaces; and/or (4) to achieve efficiencies and synergies within a supply chain that are not present in a DSD system.

14.     **Pallet Program.** Under its Pallet Program, Pepperidge Farm pays its distributors a 20% commission less a pallet assessment to cover a portion of Pepperidge Farm's palletizing and delivery costs for product that the Chain delivers to its stores in a distributor's territory. Currently, the pallet assessments are $35 for a full pallet and $20 for a half pallet. The plaintiffs earn commissions based on the gross wholesale price charged to Chain customers, and not on the net wholesale price, less any discounts or promotional allowances for Pepperidge Farm product delivered and sold at retail stores in connection with temporary sales programs. For example, distributors earn a full 20% commission even when Pepperidge Farm invests trade funds to support a promotion that will increase unit sales at a particular Chain customer, such as a "buy one get one free" offer or a 10 for $10 promotion.

15.     **Pallet Delivery Letter.** Plaintiffs McGuire, McMillen and Patterson each signed a letter (the "Pallet Delivery Letter") in connection with the execution of and as part of his or her Consignment Agreements in which these plaintiffs requested to participate in the Pallet Delivery Program. The Pallet Delivery Letter acknowledged that Pepperidge Farm may be required to deliver Consigned Product to customers in palletized form at their warehouses or cross-docking facilities. The plaintiffs agreed, in exchange for their payment of a pallet assessment to cover a portion of Pepperidge's costs incurred in connection with pallet deliveries, and in exchange for providing service to stores in connection with product

7

delivered under the pallet program, that plaintiffs would receive their 20% commission on product delivered to retail stores in their territories. Although Craig did not sign the Pallet Delivery Program letter, Pepperidge Farm has elected to extend the benefits of the Pallet Program to her and has paid her 20% commission on pallet delivered product, less an assessment to cover a portion of Pepperidge Farm's costs incurred in connection with palletizing and delivering the product. Craig has been earning commissions on pallet delivered product, and paying pallet assessments, since at least 2002.

16.     **Fresh Market Letter.**  All of the plaintiffs signed a Fresh Market letter in connection with the acquisition of their respective distributorships. The Fresh Market letter states:

> One of my Consignment Obligations, for maintaining a fresh supply of Consigned Products in retail stores, is to remove promptly from the stores all damaged and overcode (over age) items. I may re-sell overcode items for sale in stores dealing exclusively in stale products, or for sale in store areas or sections dealing exclusively in stale products, but I will not sell them to other purchasers. I understand that damaged and overcode items are not returnable to you for credit unless you make exceptions in particular cases by giving me written notice.
>
> If damaged or overcode items are found at any time in any retail store within the territory covered by my Consignment Agreement, I authorize you to remove them at my expense and I will reimburse you within one-week for your cost of purchasing and removing them from the store.

17.     **Stale Policy:**  Pepperidge Farm permits distributors to receive credit for a limited amount of Stale Product (the "Stale Policy"). Pepperidge Farm has modified the stale percentage from time to time in response to market conditions. Pursuant to the Stale Policy, Pepperidge Farm has given the plaintiffs credit for a certain amount of stale product. Pepperidge Farm's Stale Policy was communicated to each plaintiff first when he or she acquired a distributorship, and again during periodic meetings with District Sales Managers. The Stale Policy allows a percentage of stale products that a distributor may return for credit. The maximum allowable stale percentage for each distributor is calculated based on a percentage of total quarterly sales for each region. Complete stale forgiveness is granted for all new products that have been available for distribution for less than fifty-two (52) weeks, as well as special promotional packs, and seasonal items. Dollar amounts in excess of the forgiven product may be charged back to the distributor. The Stale Policy applies only to distributors who attempt to return stale or overcode product for credit.

18.   **Over-limit Charges.**  The plaintiffs have had virtually no over-limit charges under Pepperidge Farm's application of the Stale Policy. Tab 1050, ¶ 7. Pepperidge Farm, however, has forgiven thousands of dollars in the plaintiffs' over-limit charges:

- Since Mr. McGuire purchased his distributorship in 2002, he has been charged a total of $41.00 for stale product that exceeded his allowed returns under his Stale Policy. Tab 1050, ¶ 7(a). During this same period of time, Pepperidge Farm has forgiven stale charges in the amount of $5,683.54.

- Since Mr. Patterson purchased his distributorship in 2002, he has been charged $200.00 for stale product that exceeded his allowed returns under his Stale Policy. During this same period of time, Pepperidge Farm has forgiven stale charges in the amount of $5,455.26.

- Since Ms. Craig purchased her distributorship in 2002, she has been charged $143.00 for stale product that exceeded her allowed returns under her Stale Policy. Id. at ¶ 7(d). During this same period of time, Pepperidge Farm has forgiven stale charges in the amount of $5,031.49.

19.   **"Plussing-Up."**  The plaintiffs state that Pepperidge Farm sometimes sends them more product than they order.

- Ms. Craig testified that she received commission on the plussed-up product and that she would be harmed only if the product goes stale and she is charged for it. Ms. Craig has no evidence that the $143.00 she has been charged for stale since 2002 is either connected to plussing-up, or that the amount exceeded her commissions on the so-called plussed-up product.

- Mr. Patterson also testified that he gets paid a commission on any plussed-up products, and that he is harmed only if the product goes stale and he is charged for it. However, Mr. Patterson testified that the $200.00 he has been charged for stale since 2002 is not connected to plussing-up.

- Mr. McGuire also testified that he gets paid a full commission on any plussed-up product he delivers to a store.

20.   **Pricing.**  Pepperidge Farm charges its customers the same wholesale list price, whether the product is delivered via DSD or by pallets to a central warehouse. Pepperidge Farm's customers run temporary sales programs at different times on different products, and as a result, at any given time the retail price for Pepperidge Farm product at one customer's retail store may be lower than the retail price for the same product at a different customer's retail store in the same territory.

## IV.  Discussion

### A.  Breach of Contract Claims

In *RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008), the Seventh Circuit explained how federal courts are to analyze contract disputes:

> We apply state law to substantive issues in cases before us on diversity jurisdiction. *Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir. 2006). When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits. *Ind. Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8*, 314 F.3d 895, 900 (7th Cir. 2002).

This case is before the court on diversity jurisdiction, and because the parties do not raise a conflict of law issue and this case was filed in a federal court in Indiana, we apply Indiana law.

> Under Indiana law, contracts are interpreted to effectuate the parties' intent as expressed in the agreement. If the language is unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). Parol, or extrinsic evidence, is inadmissible to explain or vary the clear and unambiguous terms of a written agreement. *Evan v. Poe & Assoc., Inc.*, 873 N.E.2d 92, 101 (Ind. Ct. App. 2007). However, where the contract language is ambiguous, extrinsic evidence is permitted to ascertain the parties' intent. *Hoose v. Doody*, 886 N.E.2d 83, 90 (Ind. Ct. App. 2008).
>
> An ambiguity does not arise simply because the parties disagree on the interpretation, but "[r]ather language is ambiguous only if reasonable people could come to different conclusions about its meaning." *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distrib., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005). An ambiguity may be patent or latent. A patent ambiguity is "apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning." *Id.* at 1070-71 (internal quotation and citation omitted). On the other hand, a latent ambiguity arises only in the course of implementing the contract. *Id.* at 1071.

*Id.* at 390.

The primary purpose of contract construction is to determine the "mutual intention of the parties." *Hutchinson. Shockey, Erley & Co. v. Evansville-Vanderburah Cty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994). Such intent is discerned as of the time the contract was made and by considering the language used by the parties to express their rights and duties. *INB Banking Co.*, 598 N.E.2d at 582. If the contract itself fails to make its meaning clear the court may consider the circumstances surrounding its formation. *See American Fletcher Mortg. Co., Inc. v. Cousins Morta. and Equity Investments*, 623 F.2d 1228 (7th Cir. 1980). Oral statements by the parties of what they subjectively intended, however, are not admissible in determining intent. *See Real Estate Support Serv. v. Nauman*, 644 N.E.2d 907, 910 (Ind. Ct. App.1994). In fact, the "cardinal rule of contract interpretation is to ascertain the intention of the parties from their expression of it." *Id.*

The first step in discovering intent is to gather meaning from the "four corners" of the written document. *Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Bank. Co.*, 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992). Courts must give words their plain and usual meaning, unless review of the contract as a whole reveals some other meaning was intended. *INB Banking Co.*, 598 N.E.2d at 582. Words must be considered in context, and terms considered in relation to other terms in the contract. *Id.* If the meaning is not apparent from the plain language, the court may apply rules of construction and consider extrinsic evidence. *Id.* When reasonable persons could gather more than one meaning from the language, which meaning would require the consideration of extrinsic facts, then the term is ambiguous and interpretation would require factual determinations. *Taurus Holding Co. of America, Inc. v. Thompson*, 129 F.3d 1268 (7th Cir. 1997) (Table), 1997 WL 724513, 22-23.

The interpretation of any contract necessarily involves analysis of the particular contract language at issue, and application of case-specific facts. *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1434 (7th Cir. 1992). The plaintiffs allege five separate breaches of their individual consignment agreements. Each alleged breach is discussed below.

1.	The plaintiffs claim that Pepperidge Farm unilaterally determines the amount of product inventory that certain retail outlets in the plaintiffs' territories should receive and adds that inventory to the plaintiffs' product orders without the knowledge or consent of the plaintiffs ("plussing up" of plaintiffs' orders).

Pepperidge Farm contends that it should be granted summary judgment on this claim because even if "plussing-up" occurred, the plaintiffs were not harmed by it, because the evidence shows that each plaintiff is paid a commission on all product, and that the only possible harm would be if their stale exceeded their commissions. The plaintiffs have no such evidence, as their stale charges, if any, were *de minimus*.

In response, the plaintiffs contend that the practice of plussing-up the distributors inventory without his or her knowledge or permission violates the Consignment Agreement. Specifically, the distributor is financially responsible for all consigned product in his or her inventory including damaged and stale product which creates a financial burden, particularly in light of the fact that distributors are responsible for running his or her own business.

11

Pepperidge Farm's assertion that the only possible harm would come from stale charges is unpersuasive because it is obvious that additional product delivery requires additional labor costs from the plaintiffs. However, the plaintiffs have not provided evidence of a material breach of the Consignment Agreement; the plaintiffs were paid commission on any plussed-up orders and the plaintiffs have not provided any admissible evidence that any of their orders were plussed-up or that any stale charges were a direct result of a plussed-up order. Accordingly, **summary judgment is granted in favor of Pepperidge Farm** and against the plaintiffs on this claim.

2. The plaintiffs allege that Pepperidge Farm has unilaterally terminated his or her right to distribute products to certain retail stores namely convenience and drug chains (listed in the Convenient Availability Addendum a/k/a the Convenient Availability Addendum) located in, or that may one day be located in his or her territory in violation of the Consignment Agreement.[2] In addition, these consigned products are being shipped on pallets to a warehouse and the plaintiffs argue that they should be compensated for this product pursuant to the Pallet Program. Specifically, the plaintiffs claim that they are entitled to commissions on all Bakery products delivered to convenience stores in their territory.

Pepperidge Farm argues that summary judgment is proper on this claim because Pepperidge Farm's direct sales to convenience and drug stores is consistent with its rights under the consignment agreement for the following reasons: First, a distributor may not (without special authorization) deliver product to a Chain's central or district warehouse. Second, Pepperidge Farm has the discretion to make deliveries to central or district warehouses for its own account and has no obligation to pay the plaintiffs commission when despite its best efforts, a Chain customer refuses DSD.[3] Third, Pepperidge Farm is permitted to make deliveries in connection with temporary sales programs and provides that plaintiffs are entitled to commissions in exchange for his or her delivery related services.

In response, the plaintiffs argue that Pepperidge Farm is allowing third party distributors to deliver product to retail stores in the plaintiffs' territory. The Consignment Agreement states: "Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores. . . ." (See Term 1.) The plaintiffs have provided evidence (see for example, McGuire's Reply, Exh. A., Document PF1812-01) that Pepperidge Farm has contracted with other distributors such as Eby Brown and McLane Company to distribute product to stores within their territory. The plaintiffs argue that the Consignment Agreement prohibits Pepperidge Farm from authorizing any others to sell or deliver Pepperidge Farm consigned products in his or her protected territory. Instead, the plaintiffs assert that the Pallet Addendum, which specifically provides for shipping consigned product to a customer via their warehouse, should have been followed and the plaintiffs paid commission. The plaintiffs assert that they are entitled

---

[2] Craig states that she did not agree to the Convenient Availability Addendum but has been "forced to accept terms" without compensation.

[3] Plaintiffs dispute that Pepperidge Farm used its best effort in convincing convenience stores to accept DSD.

12

to the same commission at all retail outlets because there is no distinction in the consignment agreement between mass merchandisers, grocery stores, drug stores or convenience stores. Alternatively, the plaintiffs assert that if Pepperidge Farm wants to take this portion of his or her territory from him then he needs to be compensated per the consignment agreement.

Summary judgment on this claim as to all parties must be **denied.** There is a latent ambiguity regarding the parties' rights under these circumstances. Reasonable people could come to different conclusions regarding how the Consignment Agreements should be implemented in these circumstances. Specifically, whether Pepperidge Farm may deliver its products to a third-party distributor's warehouse for distribution within the plaintiffs' exclusive sales territory without compensation to the plaintiffs.

3. The plaintiffs allege that Pepperidge Farm "undersells" them in their territories by selling product to "stores such as Walgreens and CVS at such low prices that Walgreens and CVS can sell those products at retail for lower prices than I can sell the same products to my customers at wholesale." Pepperidge Farm asserts that summary judgment is proper on this claim because it simply does not undersell its distributors. Specifically, Pepperidge Farm states that the plaintiffs have no evidence to support this claim because Chain accounts are not the plaintiffs' customers, but Pepperidge Farm's under ¶ 3(b) of the Consignment Agreement and because Pepperidge Farm offers the same wholesale list price to all of its retail customers, regardless of whether the product is delivered DSD or by pallet to a central warehouse.

In response, the plaintiffs have not provided any admissible evidence that Pepperidge Farm ever "undersold" its product, and for this reason **summary judgment is granted in favor of Pepperidge Farm** and against the plaintiffs as to this claim.

4. The plaintiffs allege that Pepperidge Farm breached their individual Consignment Agreements by charging a "pallet fee" to the plaintiffs for product that Pepperidge Farm delivers to the warehouses of customers that also receive product from the plaintiffs via direct store delivery.

Pepperidge Farm asserts that summary judgment is proper on this claim. First, under the Consignment Agreement, Pepperidge Farm is entitled to make pallet deliveries to grocery and mass merchandise warehouses in connection with temporary sales programs and to make pallet deliveries to club store warehouses. Second, the plaintiffs are not permitted to "make deliveries of Consigned Product to any Chain via a central or district warehouse or in any manner other than directly to its retail stores," and are only entitled to a commission for products they deliver.

Third, the plaintiffs McGuire and Patterson each signed a letter in connection with the execution of, and as part of, their Consignment Agreements in which these plaintiffs requested to participate in the Pallet Delivery Program. SOF 29. The letter acknowledged that Pepperidge Farm may be required to deliver Consigned Product to customers in palletized form at their warehouses or cross-docking facilities.8 Id. The plaintiffs agreed, in exchange for their agreement to pay a pallet assessment to cover a portion of Pepperidge Farm's costs incurred in connection with pallet deliveries, and in exchange for providing service to stores in connection with product delivered under the pallet program,

that they would receive their 20% commission on product delivered to retail stores in their territories.

Finally, although Craig did not sign the Pallet Delivery Program letter, Pepperidge Farm has elected to extend the benefits of the Pallet Program to her and has paid her 20% commission on pallet delivered product, less an assessment to cover a portion of Pepperidge Farm's costs incurred in connection with palletizing and delivering the product. SOF 29. Pepperidge Farm argues that it had the discretion to pay Ms. Craig no commission at all on pallet shipments to customer warehouses, and it did not breach her Consignment Agreement by paying her more than she was entitled to receive, but less than she wanted.

In response, the plaintiffs state that sending pallets increases the amount of stale and outdated product that must be removed from the stores which creates additional work for the distributors. The plaintiffs explain that they are paid a 20% commission minus a delivery fee on pallet deliveries, but they are required to take the leftover product out of the store, which reduces the commission and then the distributor must transport product to other stores, increasing the risk of damaged product.

As alleged, there is no breach of contract as to the plaintiffs McGuire and Patterson because the circumstances described in this claim are provided for by the Pallet Delivery Program Letter. As to Ms. Craig, it does not appear that there has been a breach, but instead that the parties have simply not reached an agreement. The Consignment Agreement provides that Pepperidge Farm is entitled to make pallet deliveries under certain circumstances and Craig is not entitled to commissions for those deliveries. Similarly, there is no provision in the Consignment Agreement regarding Craig's responsibilities once the pallet arrives at her store. Under the Consignment Agreement, she is entitled to simply ignore the pallet. See Agreement, Term 2 ("Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered **by Consignee** to a purchaser."). If Pepperidge Farm expects Craig to tend to the pallet and service it as though she had made the delivery, then she can reasonably be expected to be compensated. The parties simply need to reach an agreement, as no agreement currently appears to exist. Without an agreement, there can be no breach. Accordingly, summary judgment is **granted in favor of Pepperidge Farm** and against the plaintiffs on this claim.

5.     The plaintiffs allege that Pepperidge Farm has breached the consignment agreement by charging the plaintiffs for the amount of overcode product returned to it in excess of a "thrift cap."

Pepperidge Farm asserts that it's Stale Policy does not breach the Consignment Agreement. Each of the plaintiffs signed a Consignment Agreement consisting of various contemporaneously executed documents that set forth the terms and conditions under which the plaintiffs may distribute Pepperidge Farm products. One such document was the Fresh Market Letter, which each plaintiff executed and agreed: "I understand that damaged and overcode items are not returnable to you for credit unless you make exceptions in particular cases by giving me written notice." Pepperidge Farm products are consigned to

14

the plaintiffs, and the plaintiffs have an obligation to care for them. Pepperidge Farm contends that the plaintiffs are able ensure that a product does not spoil or go stale based on their very small stale charge backs from the time they purchased their distributorships to the first quarter of fiscal year 2008: McGuire, $41.00; Craig, $143.00; Patterson, $200.00.

In response, the plaintiffs generally argue that this provision is unfair. According to the Consignment Agreements, the plaintiffs must accept sufficient quantities of product to maintain an adequate and fresh supply and that the product is the exclusive property of Pepperidge Farm until it is delivered by the plaintiffs to a purchaser. The plaintiffs contend that it is impossible to not have at least some stale and/or damaged product, particularly when they are not in control of the product arriving at the stores on pallets and that they should not be financially liable for this product particularly when they are not in control of the amount of product delivered to a particular store. The plaintiffs have provided no evidence that they have been charged for overcode product as a direct result of returning product which arrived at any store through a pallet delivery.[4]

There is no doubt that this is a one-sided provision within the agreement. However, there is no indication that there has been a breach of contract as to this provision. The Fresh Market Letter provides that damaged and overcode items are not returnable for credit, regardless of whether they are removed by the plaintiffs or Pepperidge Farm. Accordingly, **summary judgment on this claim must be granted in favor of Pepperidge Farm** and against the plaintiffs.

### B. Plaintiffs' Interference Claims

The plaintiffs contend that Pepperidge Farm tortiously interfered with their actual and prospective business relationships by directly delivering product to certain stores in their respective territories. Pepperidge Farm argues that summary judgment should be granted in its favor because the plaintiffs cannot establish the elements of such a claim. The plaintiffs do not address this argument in their response briefs.

To prevail on claims for tortious interference with prospective and existing business relationships, the plaintiffs must show (1) the existence of a valid business relationship; (2) Pepperidge Farm's knowledge of the existence of the relationship; (3) Pepperidge Farm's intentional interference in the relationship; (4) the absence of any justification; and, (5) damages resulting from Pepperidge Farm's interference. *Miles Distributors, Inc. v. Specialty Construction Brands,* Inc., 476 F.3d 442 (7th Cir. 2007)(citing *Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind. App. 2000)); *Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876-77 (Ind. App. 1998), *trans. denied*, 714 N.E.2d 171 (Ind. 1999).

---

[4] Had such evidence been provided, the court would necessary determine whether the consignment agreement or subsequent addendums provide for whom will be held responsible for pallet delivered product when it does not sell. This is not the question presented by the evidence and therefore the court need not speculate on the outcome of this analysis.

Summary judgment must be **granted in favor of Pepperidge Farm and against the plaintiff on the claim of tortious interference with prospective and existing business relationships.** The reason for this ruling is that the plaintiffs have not provided the evidence necessary to establish such a violation.

## V.  Conclusion

The plaintiffs' motions for summary judgment (dkts 169, 170, and 171) are **granted in part and denied in part,** and the defendant's motion for summary judgment (dkt 172) is **granted in part and denied in part as follows:**

Summary judgment is granted in favor of the defendant and against the plaintiffs on all claims except the following:

> Whether Pepperidge Farm has breached its agreement with the plaintiffs by delivering its products to a third-party distributor's warehouse for distribution within the plaintiff's exclusive sales territory without compensation to the plaintiffs.

As to this claim, summary judgment is denied as to both parties, this breach of contract claim is the only claim which remains in this action.

No partial final judgment shall issue at this time as to the claims resolved in this Entry.

The plaintiffs shall have **through March 26, 2009**, in which to notify the court in writing whether they seek the court's assistance in recruiting counsel to represent them in this matter.

**IT IS SO ORDERED.**


Date:  03/03/2009

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Susanne Noyes Geraghty
GOODWIN PROCTER LLP
sgeraghty@goodwinprocter.com

Forrest A. Hainline III
GOODWIN PROCTER LLP
fhainline@goodwinprocter.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com

Jenay Craig
725 E. Epler Avenue
Indianapolis, IN 46227

Dennis McGuire
6825 Farmleigh Drive
Indianapolis, IN 46220

Elizabeth McMillen
8589 Sunningdale Road
Indianapolis, IN 46234

Randy Patterson
2730 S. Pasadena Street
Indianapolis, IN 46203