**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

JENAY CRAIG, et al., )
)
Plaintiffs, )
vs. ) 1:06-cv-954-SEB-DML
)
PEPPERIDGE FARM, INC. )
)
Defendant. )

## Entry Discussing Cross-motions for Summary Judgment

This case was originally brought by twelve Pepperidge Farm distributors. At this time, three distributors – Jenay Craig, Randy Patterson, and Dennis McGuire (collectively, "plaintiffs") – have a breach of contract claim remaining. Both Pepperidge Farm and the plaintiffs seek resolution of these claims through the entry of summary judgment.[1] See dkts. 292-294, 303-305.[2]

## I. Summary of Claims

The plaintiffs each paid a large sum of money for the right to be the exclusive distributor of Pepperidge Farm products in a specific territory and to receive commissions for the products sold in that territory. Those rights and the exceptions thereto were memorialized in their respective consignment agreements, which in the case of Randy Patterson and Dennis McGuire include a Pallet Addendum and in the case of Jenay Craig include the Indiana Disclosure Statement.[3] Pursuant to the consignment agreements, the distributors provide traditional direct store delivery ("DSD") of Pepperidge Farm's products; meaning they pick up product from Pepperidge Farm's warehouse and deliver it to individual retail stores where they stock the shelves, remove stale items, and set up promotional displays. The present dispute began when certain stores determined that they

---

[1] Following the court's March 3, 2009, Entry, the plaintiffs, proceeding *pro se*, requested the court's assistance in recruiting counsel. The court found that the assistance of counsel in the presentation of the remaining claims would be beneficial to the just and efficient resolution of this case. Accordingly, the plaintiffs' request was granted and William M. Horne entered his appearance on behalf of the plaintiffs pursuant to the court's request. See Local Rule 4.6.

[2] Both motions have been fully briefed. The court finds that the briefing is sufficient and an oral argument is not necessary, thus **the defendant's motion for oral argument (dkt 310) is denied.**

[3] The consignment agreements and related documents are referenced throughout this Entry. These documents can be found at dkt. 303 Ex. A (McGuire Consignment Agreement - Pallet Addendum at p. 21), Ex. H (Craig 1998 Consignment Agreement), Ex. I (Craig 2000 Consignment Agreement), Ex. K (Ind. Disclosure Statement), Ex. M (Patterson 2002 Consignment Agreement), Ex. O (Patterson 2004 Consignment Agreement - Pallet Addendum at p. 19).

did not want DSD, but instead wanted products delivered to their retail stores via their central warehouse or a third-party distributor. Pepperidge Farm complied with its customers requests (or demands) and as a result the plaintiffs have not been compensated for Pepperidge Farm products sold at certain retail stores in their exclusive distribution territories. The plaintiffs argue that Pepperidge Farm is liable for commissions on products delivered to stores within their territories under the terms of their agreements. Pepperidge Farm argues that under paragraph 7 of the consignment agreement, the plaintiffs' failures to service the convenience and drug stores in their territories, and their admitted inability ever to do so, gave Pepperidge Farm the right to make alternative arrangements for service to these stores, and to remove the stores from plaintiffs' territories without compensation.

For the reasons explained below the plaintiffs' motion for summary judgment is granted (dkt 305) and Pepperidge Farm's motion for summary judgment (dkt 292) is denied.

## II. Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c) of the *Federal Rules of Civil Procedure*. A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Springer v. Durflinger,* 518 F.3d 479, 483 (7th Cir. 2008)(quoting *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir. 2007), and *Brummett v. Sinclair Broad. Group, Inc.,* 414 F.3d 686, 692 (7th Cir. 2005)). When, as in this case, the parties have filed cross-motions for summary judgment, "'we construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made.'" *Cavin v. Home Loan Center, Inc.,* 531 F.3d 526, 528-29 (7th Cir. 2008) (quoting *Premcor USA v. Am. Home Assurance Co.,* 400 F.3d 523, 526 (7th Cir. 2005)).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2)."'[A] party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered."' *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983))."The nonmovant will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion." *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693,

699 (7th Cir. 2002) (internal quotation and citation omitted). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp.,* 477 at 322-23; *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metropolitan Life Ins. Co.,* 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex,* 477 U.S. at 324.)

## III. Material Facts Not in Dispute

1. **Consignment Agreement.**[4] Each of the plaintiffs signed an individual Consignment Agreement consisting of various contemporaneously executed documents that set forth the terms and conditions pursuant to which the plaintiffs may distribute certain Pepperidge Farm products. Patterson paid $110,000.00, Craig paid $90,000.00 and McGuire paid $50,000.00.

2. **Exclusiveness of Distributorship.** The Consignment Agreement gives each plaintiff the right to distribute Consigned Product in a particular Territory or Sales Area. Paragraph 1 of the Consignment Agreement provides:

> **EXCLUSIVENESS OF DISTRIBUTORSHIP.** Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3(b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery. The terms of this Paragraph are subject, however, to the terms of Paragraphs 6,[5] 7, and 9.

---

[4] In total, the plaintiffs signed five different agreements, but these contracts differ little except in their route descriptions and, in plaintiff Craig's case, the absence of a Pallet Addendum and the inclusion of the Indiana Disclosure Statement.

[5] Paragraph 6 of the Consignment Agreement is not at issue in this case. That paragraph contains provisions relating to emergency service.

3. **Paragraph 7** of the Consignment Agreement provides:

> **FAILURE TO SERVICE PARTICULAR STORES.** If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

4. **Paragraph 9 of the Consignment Agreement provides**:

> **PROHIBITED SALES AND DELIVERIES.** Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Product to any Chain[[6]] via a central or district warehouse or in any manner other than directly to its retail stores. If despite the best efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such Chain for its own account via such warehouse deliveries, as long as such refusal remains in effect. In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period of time set forth in such written request distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

5. **Solicitation of Retail Stores.** The Consignment Agreement requires a distributor to "use his/her best efforts to realize the full sales potential of the Territory for Consigned Products. To this end, Consignee will (a) actively solicit all retail stores in the Territory

---

[6] "Chain" is defined as "any person, firm, corporation or other legal entity that owns or operates three or more retail stores."

whose accounts can [be] profitably handled. . ." Consignment Agreement, ¶ 4. Any attempts made by the plaintiffs to sell product by DSD at convenience or drug stores in his or her territory were unsuccessful with one exception: McGuire delivered product for a time to BP Connect until he was told that the store would no longer accept DSD.

6. **Customer Demands.** Certain customers[7] have demanded deliveries via central or district warehouses. As a result, Pepperidge Farm has commenced warehouse deliveries to some of these customers' central or district warehouses. Customers demand central warehouse delivery for a variety of reasons, including: (1) to achieve uniform service levels; (2) to eliminate problems associated with non-existent, poor, or infrequent delivery service; (3) to avoid having Chain store customers compete with delivery trucks for parking spaces; and/or (4) to achieve efficiencies and synergies within a supply chain that are not present in a DSD system.

7. **Eby-Brown.** Eby-Brown is a company that distributes numerous products that are sold at convenience stores. Pepperidge Farm delivers product to warehouses operated by entities like Eby-Brown for delivery to retail stores.

8. **Pallet Addendum.** Plaintiffs McGuire and Patterson each signed a letter (the "Pallet Addendum") in connection with the execution of and as part of his Consignment Agreement in which these plaintiffs requested to participate in the Pallet Delivery Program. Under the Pallet Program, when product is delivered to a customer's warehouse or cross-docking facilities, the distributors receive a commission on product that customer delivers to its stores in a distributor's territory. This addendum promises the plaintiffs a 20% commission on product delivered to retail stores in their territories, less a pallet assessment to cover a portion of Pepperidge Farm's costs incurred in connection with pallet deliveries. The Pallet Addendum states in relevant part:

> I understand that from time to time Pepperidge Farm may be requested to deliver Consigned Products to customers in palletized form through their warehouses or cross-docking facilities. I hereby request that Pepperidge Farm affect such cross-dock/warehouse delivery to these customers for my account pursuant to the Pallet Delivery Program in effect at Pepperidge Farm from time to time. I agree to participate in that Pallet Delivery Program and to comply with its terms. I understand and agree that, under such Pallet Delivery program Pepperidge Farm (i) may, at its option, deliver Consigned Products to a customer's warehouse and/or cross-docking facility for delivery to retail stores in my territory and (ii) shall pay me an amount equal to the commissions for the Consigned Products so delivered to retail stores in my territory computed at the rate specified in Schedule B of my Consignment

[7] These customers include 7-Eleven, Loaf N' Jug, Stewart Shops, Deal$, Menard's Hardware, HMS Host, Pay N' Save, Allsup's, Toys 'R Us, Babies 'R Us, Circle K, Sheetz, Kwik Trip, Rich Oil, Speedway, SuperAmerica, Save-A-Lot, Affiliated Foods Midwest, Hudson News, Duckwall-Alco, BP Amoco, Casey's General Stores, Hess, Valero, Exxon Mobil, Wawa, Walgreens, Rite Aid, CVS, Pilot, Fresh & Easy, W.H. Braum and Family Express.

> Agreement, less an amount to cover a portion of the costs incurred in connection with such Pallet Delivery Program and the delivery of products thereunder. . . .
>
> I agree that once such Consigned Products are so delivered to any retail store in my territory, I will, when requested, provide service to those stores for such products as though they had been delivered by me under the terms of the Consignment Agreement.
>
> I acknowledge and agree that Pepperidge Farm may at any time modify, change or terminate the Pallet Delivery Program and/or the amounts paid thereunder, but I request 30 days' notice of any such change. I further acknowledge and agree that the rights set forth in this letter are in addition to, and not in lieu of, any other rights or obligations contained in the Consignment Agreement, including, without limitation, the rights of Pepperidge Farm under the terms of Section 9 of that Agreement.

Although Craig did not sign the Pallet Delivery Program letter, Pepperidge Farm has paid her 20% commission on pallet delivered product, less an assessment to cover a portion of Pepperidge Farm's costs incurred in connection with palletizing and delivering the product. Craig has been earning commissions on pallet delivered product, and paying pallet assessments, since at least 2002.

9. **Indiana Disclosure Statement**. Paragraph 9 of the Indiana Disclosure Statement provided by Pepperidge Farm and signed by Jenay Craig on October 3, 2000, states:

> Where the Consigned Products are not delivered to a store by the distributor but instead are palletized and delivered, under Bakery's pallet delivery or surge volume programs, either directly by Bakery or indirectly by Bakery through the customer's cross dock or warehouse facilities, the distributor receives full commission on the sale of the Consigned Products delivered to the retail store in his/her Territory but must reimburse Bakery for a portion of the costs incurred by Bakery in effecting such distribution.

Dkt. 303, Pl.'s Ex. K. ¶9

## IV. Discussion

### A. Contract Interpretation

This case is before the court on diversity jurisdiction, and because the parties do not raise a conflict of law issue and this case was filed in a federal court in Indiana, we apply Indiana law. See *RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008).

The primary purpose of contract construction is to determine the "mutual intention of the parties." *Hutchinson. Shockey, Erley & Co. v. Evansville-Vanderburah Cty. Bldg. Auth.*, 644 N.E.2d 1228, 1231 (Ind. 1994). Such intent is discerned as of the time the contract was made and by considering the language used by the parties to express their rights and duties. *INB Banking Co.* v. Opportunity Options, Inc., 598 N.E.2d 580, 582 (Ind. Ct. App. 1992). The first step in discovering intent is to gather meaning from the "four corners" of the written document. *Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Bank. Co.*, 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992). Courts must give words their plain and usual meaning, unless review of the contract as a whole reveals some other meaning was intended. *INB Banking Co.*, 598 N.E.2d at 582. The interpretation should harmonize the contract's provisions rather than create a conflict. *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990). It should give effect to all words, terms, and phrases rather than rendering some ineffective or meaningless. *Trustcorp Mortgage Co. v. Metro Mortgage Co., Inc.*, 867 N.E.2d 203, 213 (Ind. Ct. App. 2007). Particular words, phrases, or paragraphs must be considered in relation to the whole, not in isolation. *Huntington Mortgage Co. v. DeBrota*, 703 N.E.2d 160, 164 (Ind. Ct. App. 1998). Specific terms will control over general terms. *Salcedo v. Toepp*, 696 N.E.2d 426, 436 (Ind. Ct. App. 1998). In addition, writings executed at the same time and relating to the same transaction may be considered in determining the parties' intent. *Geico Ins. Co. v. Rowell*, 705 N.E.2d 476, 482 (Ind. Ct. App. 1999). Absent contractual language indicating that the documents are unrelated, the instruments are construed together. *Ruth v. First Fed. Sav. & Loan Ass'n.*, 492 N.E.2d 1105, 1107 (Ind. Ct. App. 1986). Depending on the factual circumstances, this rule may even be applied to related documents that are not executed simultaneously but are part of the same transaction. *Geico*, 705 N.E.2d at 482.

When reasonable persons could gather more than one meaning from the contract language, which meaning would require the consideration of extrinsic facts, then the term is ambiguous and interpretation would require factual determinations. As such, its construction is a matter for the fact-finder. *Fresh Cut, Inc. v. FazliI,* 650 N.E.2d 1126, 1133 (Ind. 1995); *see also BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 362 (7th Cir. 2009) (finding that when the contract language is ambiguous, resolving the meaning of the contract on summary judgment is inappropriate.).

Ambiguities may be construed against the drafter, in this case Pepperidge Farm, without considering whether extrinsic evidence would clarify the parties' intent. "The Indiana Supreme Court has occasionally applied the rule without considering whether extrinsic evidence would clarify the parties' intent." *BKCAP*, 572 F.3d at 360-61 (citing *MPACT Const. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004) ("When there is ambiguity in a contract, it is construed against its drafter."); *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997) ("When an insurance contract contains an ambiguity, it should be strictly construed against the insurance company."); *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985) (holding that insurers' extrinsic evidence was inadmissible to clarify an ambiguous coverage provision). However, resolving such ambiguities against the drafter is only possible if the plaintiffs offer an interpretation of the contract that is reasonably consistent with the contract language.

*BKCAP*, 572 F.3d at 361 (citing *MPACT*, 802 N.E.2d at 910 (concluding that certain contractual provisions "support both [parties'] arguments" and therefore construing against the drafter); *Showboat Marina Casino P'ship v. Tonn & Blank Constr.*, 790 N.E.2d 595, 598-99 (Ind. Ct. App. 2003) (recognizing the non-drafter's right to sue on a contract that contained language consistent with both the right to sue and mandatory arbitration)). *See also Keesling v. T.E.K. Partners, LLC*, 861 N.E.2d 1246, 1254 (Ind. Ct. App. 2007) (stating that "[a]ny ambiguities in a contract are to be construed against the party who employed the language and prepared the contract").

**B. Extrinsic Evidence**

The findings set forth below rely on principles of contract construction to determine the "mutual intention of the parties" at the time the contract was made and by considering the language used by the parties to express their rights and duties. *Hutchinson,* 644 N.E.2d at 1231. The findings do not rely on extrinsic facts and the court has not made factual determinations; instead, to the extent a term could be considered ambiguous, such ambiguities were construed against the drafter, Pepperidge Farm.

It is for this reason, that Pepperidge Farm's recurring arguments that 1) the plaintiffs want something for nothing, and 2) the plaintiffs are to blame for certain stores' refusal to accept DSD, are rejected. Such arguments are well outside of the "four corners" of the written documents.[8] In this same vein, the court has not considered the plaintiffs' argument that the Convenient Availability Addendum drafted by Pepperidge Farm is tantamount to an admission that it must pay the plaintiffs' commissions on all products that are shipped by normal shipping practices, on pallets, to customer warehouses for eventual sale at retail stores in their territories. The Convenient Availability Addendum is extrinsic evidence not necessary to the interpretation of the Consignment Agreements at issue.

**C. The Consignment Agreements**

The Consignment Agreements must be construed together with the Pallet Addendum, in the case of McGuire and Patterson, and the Indiana Disclosure Statement in the case of Craig. The "contemporaneous documents rule" establishes that, in the absence of an indicator of contrary intention, "documents executed simultaneously as part of a single transaction will be construed together as one instrument." *Winforge, Inc. v. Coachmen Industries, Inc.*, 2008 WL 4098975, *14 (S.D. Ind. August 27, 2008) (Barker, J.); *Conner v. Instant Cash Advance*, 2003 WL 446197, *3 (S.D. Ind. February 20, 2003)

---

[8] In addition, there is no evidence that the plaintiffs are either lazy or incompetent. Instead, the evidence suggests that they want what they believe they paid for, an exclusive distributorship. The undersigned judge gave her impression of the plaintiffs' work ethic at the conclusion of the December 6, 2006, preliminary injunction hearing. "I was impressed with the testimony of several of you about how totally industrious you are, how you commit huge amounts of time and energy and interest and so forth into building your business and reaping the rewards of that." Dkt. 70, p. 457. That impression remains unaltered.

(Barker, J.); *Salcedo v. Toepp*, 696 N.E.2d 426, 435 (Ind. Ct. App.1998) ("In the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction will be construed together in determining the contract."). The application of the contemporaneous documents rule is fact-dependent. *Ruth v. First Fed'l Savings and Loan Ass'n of LaPorte County*, 492 N.E.2d 1105, 1107 (Ind. Ct. App. 1986).

In this case, the documents are construed together as part of a single agreement. The reason for this ruling is that it is clear from the face of the documents that at the time they were executed they were part of the same transaction and the parties intended for them to be construed together. *See Ruth*, 492 N.E.2d at 1107. The Pallet Addendum was presented to McGuire and Patterson at closing. While the main body of the Consignment Agreement contained an integration clause, this clause also provided that it could be modified by a writing signed by both parties. (Consignment Agreement ¶ 28.) The Pallet Addendum was such a writing signed by both parties. And as such, it became part of the Consignment Agreement. Similarly, the Indiana Disclosure Statement was entered into in advance of the consignment agreement but as part of that same transaction. *Geico,* 705 N.E.2d at 482.

**D. Warehouse Deliveries**

The plaintiffs argue that their consignment agreements require Pepperidge Farm to pay commissions on products shipped to a customer's warehouse and later sold at stores within their territories.

***Pallet Addendum***

Plaintiffs argue that Pepperidge Farm agreed in the Pallet Addendum to pay commissions on shipments "in palletized form" to customer warehouses or cross-docking facilities. The Pallet Addendum states:

> [U]nder such Pallet Delivery program Pepperidge Farm (i) may, at its option, deliver Consigned Products to a customer's warehouse and/or cross-docking facility for delivery to retail stores in my territory and (ii) shall pay me an amount equal to the commissions for the Consigned Products so delivered to retail stores in my territory. . . . I further acknowledge and agree that the rights set forth in this letter are in addition to, and not in lieu of, any other rights or obligations contained in the Consignment Agreement, including, without limitation, the rights of Pepperidge Farm under the terms of Section 9 of that Agreement.

This provision is clear evidence of the parties' understanding that the plaintiffs would be paid a commission for the product Pepperidge Farm delivered to a customer's warehouse which was later delivered to a retail store in his or her territory. This promise is

in mandatory language, using the words "shall pay." The consideration for this promise was the Consignment Agreement itself and the plaintiffs' agreement to service the products "when requested." Neither the main body of the Consignment Agreement nor the Pallet Addendum itself states that Pepperidge Farm's promises are limited to temporary sales programs. It merely states that from time to time Pepperidge Farm may get such requests. The plaintiffs were justified in believing that from time to time Pepperidge Farm would receive a customer request that all deliveries be made through a central warehouse – for which they would be paid a commission, less delivery costs, when such products were ultimately shipped to their stores.

In addition, the statement – "rights set forth in this letter are in addition to, and not in lieu of, any other rights or obligations contained in the Consignment Agreement" – is consistent with the court's interpretation. The rights and obligations in the Pallet Addendum were "in addition to" the rights and obligations contained in the Consignment Agreement, including paragraph 9.[9] Thus, McGuire and Patterson were justified in believing that the Pallet Addendum, as a modification and as the more specific provision, controlled the contractual expectations. The additional words "and not in lieu of" merely confirmed their rights to receive pay and obligations to service product, and Pepperidge Farm's right to market and deliver products to chains requiring warehouse delivery.

If Pepperidge Farm did not intend the Pallet Addendum to apply to all pallet deliveries, it could have easily clarified that intention. A few declarative statements would have done the trick. Even just one: "This pallet addendum applies only to temporary sales programs." That Pepperidge Farm chose not to include such a simple sentence reflects that, at the time, Pepperidge Farm intended to pay the plaintiffs for warehouse deliveries.

***Indiana Disclosure Statement***

Even Jenay Craig was justified in believing Pepperidge Farm's assurances that she would be paid for all warehouse deliveries. Paragraph 9 did not clearly state that she would not be paid, and the Indiana Disclosure Statement, which was executed close in time and signed "Very truly yours, Pepperidge Farm Incorporated," expressly told Craig that she would receive a commission for products delivered under Pepperidge Farm's pallet delivery or surge volume program, whether delivered "directly by [Pepperidge Farm] or indirectly by

---

[9] Paragraph 9 states that if a chain refuses to accept deliveries of Pepperidge Farm except by warehouse delivery, Pepperidge Farm would have the "right, at its discretion, to sell and deliver the Consigned Products directly to such Chain for its own account via such warehouse deliveries." But what did "for its account" mean? Under paragraph 3, chain customers could also request direct billing, and such stores would become Pepperidge Farm's customers. (Consignment Agreement ¶ 3(b).) Yet the distributors would still receive commissions in return for soliciting sales and delivering product. Paragraph 9 did not require any such effort, but it also did not state – as Pepperidge Farm could easily have written – that the distributors would not be paid under this circumstance. It simply said Pepperidge Farm could make the sales and deliver the product.

[Pepperidge Farm] through the customer's cross dock or warehouse facilities." (Ind. Disclosure Statement ¶ 9.) The Indiana Disclosure Statement provides:

> Where the Consigned Products are not delivered to a store by the distributor but instead are palletized and delivered, under Bakery's pallet delivery or surge volume programs, either directly by Bakery or indirectly by Bakery through the customer's cross dock or warehouse facilities, the distributor receives full commission on the sale of the Consigned Products delivered to the retail store in his/her Territory but must reimburse Bakery for a portion of the costs incurred by Bakery in effecting such distribution.

The March 4, 2009, Entry, held that Craig was not entitled to pallet payments because she had not signed the Pallet Addendum. (See dkt. 264 at p.14.) At that time, the plaintiffs were proceeding *pro se* and the Indiana Disclosure Statement was not considered. Upon reconsideration, the court finds that Craig's consignment agreement incorporates the Indiana Disclosure Statement and that Craig is entitled to "full commission on the sale of the Consigned Products delivered to the retail store in her territory" less a portion of the distribution costs. To the extent this finding is inconsistent with the court's prior statements, this finding is controlling.

### ***Paragraph 7***

Pepperidge Farm argues that regardless of the specific provisions in the Pallet Addendum and the Indiana Disclosure Statement, paragraph 7 of the Consignment Agreement entitles it to remove any store from the distributors' territory if, for any reason, the distributor fails to provide satisfactory distribution service to that store.[10] Pepperidge Farm argues because the plaintiffs never serviced any convenience or drug store in their territories it has the absolute right to take these stores away from the distributors without compensation.

---

[10] As previously stated, Paragraph 7 of the Consignment Agreement provides:

> If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

In response, the plaintiffs argue that paragraph 7 only makes sense when it is applied to the service of existing customers and it was not intended to allow Pepperidge Farm to stop paying commissions under the Pallet Addendum (or, in Jenay Craig's case, as promised in the Indiana Disclosure Statement) when it made alternate arrangements to ship the goods directly to customer warehouses or distribution centers.

After considering the consignment agreements in their entirety, the court finds that paragraph 7 does not give Pepperidge Farm the right to remove stores from the plaintiffs' territory without compensation when instead of DSD those stores have requested or demanded delivery via their warehouse. The Pallet Addendum and Indiana Disclosure Statement specifically provide for these circumstances. Pepperidge Farm agreed to pay commissions on shipments that it, and not the distributors, delivered to customer warehouses and distribution centers. There was no requirement that the plaintiffs provide service to these stores. The distributors need only provide service to the stores "when requested."

Paragraph 7 can only reasonably be understood as providing a way by which a store or chain could be removed from a DSD's territory when a distributor failed to provide satisfactory service. It cannot be properly understood, as Pepperidge Farm suggests, to give Pepperidge Farm the right to remove all stores that are not existing DSD customers from a distributors' territory without compensation. Paragraph 7 simply states that if a distributor "fails for any reason to provide or maintain satisfactory distribution service" to a store (or segment of the Territory in the case of McGuire and Patterson), then the store (or segment) may be removed from the distributor's territory if Pepperidge Farm provides written notice and the distributor fails to cure the unsatisfactory service. By its plain wording, paragraph 7 applies to "service" – the delivery of products, straightening of shelves, and removal of outdated product – not to failures to solicit sales from new customers, which is specifically addressed by paragraph 4 and paragraph 19 (the termination for cause provision).[11] This interpretation is consistent with the remainder of the paragraph, which provides the distributors with an opportunity to correct any service issues, and allows Pepperidge Farm, if it chooses, to make alternate arrangements for service on a temporary or permanent basis. The provision is simply stating, if you are not doing your job, for whatever reason, fix the problem or we will find someone else to provide DSD to that store or stores.

To the extent there is any ambiguity, the court's understanding is consistent with reasonableness and good faith. *See First Fed. Sav. Bank*, 559 N.E.2d at 604 (stating that where the intentions of the parties cannot be reasonably ascertained "a court may have to presume the parties were acting reasonably and in good faith in entering into the contract").

[11] Pepperidge Farm argues that reliance on Paragraph 19 would harm the distributors. Paragraph 19 states that the Pepperidge Farm may terminate this Agreement if the distributor fails to "adequately [] realize the sales potential of the Territory" and fails "to make satisfactory improvements within thirty days after notice of inadequacy from Bakery." However, termination of the agreement would at least entitle the distributor "to receive compensation therefor in accordance with the established business practices of Bakery." Removal of a store or territory pursuant to Paragraph 7 is "all without compensation or remuneration to Consignee."

**E. Shipments to Wholesalers**

Plaintiffs argue that Pepperidge Farm breached the Consignment Agreements when it shipped products to wholesalers (like Eby-Brown) for distribution within the plaintiffs' territories.

In response, Pepperidge Farm argues that its delivery of product to warehouses operated by third-party distributors is appropriate under paragraph 9 of the Consignment Agreement, which states that when a chain refuses to handle Pepperidge Farm products except through warehouse deliveries, Pepperidge Farm can sell and distribute the products directly to the chain. Paragraph 9 provides:

> If, despite the best efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, [Pepperidge Farm] shall have the right in its discretion to sell and deliver the Consigned Products directly to such Chain for its own account via such warehouse deliveries, as long as such refusal remains in effect.

Pepperidge Farm argues that paragraph 9 allows for delivery to any "warehouse," not just company-owned warehouses.

Paragraph 1 of the Consignment Agreement grants the plaintiffs "the exclusive right to distribute Consigned Products to retail stores within their Territory," and provides that Pepperidge Farm "will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores . . . within the Territory" except in specific circumstances which do not apply here and "subject, however, to the terms of Paragraphs 6, 7, and 9." Contrary to Pepperidge Farm's assertion, paragraph 9 does not grant Pepperidge Farm the right to deliver product through other distributors, even at a customer's request.

The court agrees with the plaintiffs' view that when paragraph 9[12] is read in context, it should be understood as applying only to the customer's central or district warehousing. Paragraph 9 begins by prohibiting the plaintiffs from delivering a product to any "Chain via a central or district warehouse." This makes sense. Pepperidge Farm does not want one

---

[12] Again, Paragraph 9 states:

> Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Product to any Chain via a central or district warehouse or in any manner other than directly to its retail stores.

distributor making a side deal with a customer to deliver product directly to a central or district warehouse serving multiple distributors' territories. Such a distributor could end up selling product destined for other distributors' stores. Clearly, in this context, the Consignment Agreement is referring to the customer's central or district warehouse. Paragraph 9 is directed specifically at customer warehouses, and if any ambiguity remains, Indiana law requires this ambiguity to be resolved in the plaintiffs' favor.

The court rejects Pepperidge Farm's argument that wholesalers such as Eby-Brown are the "outsourced warehouse" of its customers. Pepperidge Farm has admitted that it engaged Eby-Brown Co. to distribute its products to Speedway convenience stores operated by SuperAmerica, LLC. (R. DeVitto Test., Tr. Prelim. Inj. Hr'g dkt 303-2, 426-30.) Eby-Brown also produced copies of an unsigned distribution agreement between Pepperidge Farm and Eby-Brown establishing a pricing list for the distribution of Pepperidge Farms products and Eby-Brown's percent commission and pricing communications between Eby-Brown and Pepperidge Farm for product orders. (See Eby-Brown Initial Production Excerpts, Ex. V, dkt 304, filed under seal.) In the absence of any evidence showing that Pepperidge Farm customers such as Speedway hired Eby-Brown to provide warehouse services – and that the compensation for such services was tied to the costs of storage and delivery, unrelated to the cost or price of the products distributed – there is no triable issue of fact. Eby-Brown was not an "out-sourced warehouse." As the record establishes, Eby-Brown was simply performing its business as a wholesaler – the traditional middleman distributor between manufacturer and customer and was not simply an "outsourced warehouse."

## V. Conclusion

Pursuant to Rule 56(d), the court finds as follows:

1. For the reasons set out above, the plaintiffs are entitled to summary judgment (dkt 305) on their breach of contract claim. The damages the plaintiffs are entitled to cannot be determined at this time. Thus, the plaintiffs' motion is **granted** as to liability alone, pursuant to Rule 56(d)(2).

2. Pepperidge Farm's motion for summary judgment (dkt 292) is **denied.**

3. Pursuant to Rule 56(d)(1), the court finds that the following facts are not genuinely in dispute: Pepperidge Farm breached the plaintiffs' consignment agreements when it failed to pay commissions on products delivered to an independent wholesaler or by pallet to a customers' warehouse and subsequently delivered by any means to stores in the plaintiffs' territories. Pepperidge Farm is liable for commissions on shipments to customer warehouses and distributions through independent wholesalers.

4. To the extent the findings in this Entry conflict with the Entry of March 4, 2009 (dkt 264, see also dkt 266), this Entry is controlling. The findings in this Entry are specific to the questions at hand and additional facts have been presented and arguments asserted by the parties.

The amount of damages the plaintiffs are entitled to remains unresolved. The Magistrate Judge shall set a status conference to discuss the possible resolution of the claim for damages either through settlement or otherwise.

**IT IS SO ORDERED.**

Date: 08/27/2010

Sarah Evans Barker

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Susanne Noyes Geraghty
GOODWIN PROCTER LLP
sgeraghty@goodwinprocter.com

Forrest A. Hainline III
GOODWIN PROCTER LLP
fhainline@goodwinprocter.com

William M. Horne
HORNE LAW LLC
hornelaw@comcast.net

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com