# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JENAY CRAIG, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | 1:06-cv-954-SEB-DML |
| | ) | |
| PEPPERIDGE FARM, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**Entry Denying Motion for Reconsideration**

Before the Court is Defendant Pepperidge Farm, Incorporated's ("Pepperidge Farm") motion for reconsideration of the Court's August 30, 2010, Entry Discussing Cross-motions for Summary Judgment (the "August 30, 2010 Order"). See dkt. 315. Our August 30, 2010, Order found Pepperidge Farm liable for breaching its agreements with plaintiffs Jenay Craig, Dennis McGuire, and Randy Patterson (collectively the "Plaintiffs"). In addressing the current motion, the Court assumes the reader's familiarity with the August 30, 2010 Order. Thus, the underlying facts of this action are not reiterated herein.

A motion to reconsider is designed to correct manifest errors of law or fact or to present newly discovered evidence. *Publishers Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985). For example, a motion for reconsideration is appropriate when: (1) a court has patently misunderstood a party; (2) a court has made a decision outside the adversarial issues presented; (3) a court has made an error not of reasoning but of apprehension; or (4) a change in the law or facts has occurred since the submission of the issue. *Bally Export Corp. v. Balicar, Ltd.*, 804 F.2d 398, 404 (7th Cir. 1986). A motion for reconsideration is an "improper vehicle to introduce evidence previously available or to tender new legal theories." *Id.*

"This Court's orders are not mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988).

Pepperidge Farm argues that the Court's interpretation of the agreement at issue (including the Consignment Agreement, Pallet Addendum and Indiana Disclosure Statement) (collectively the "agreement") is based on manifest errors of law. These errors purportedly include: (1) improperly construing ambiguities against Pepperidge Farm without resort to extrinsic evidence; (2) interpreting the relevant agreements in a manner inconsistent with Plaintiffs' own conduct; (3) interpreting the relevant agreements in a manner that conflicts with other provisions of the Consignment Agreement, thereby violating principles of contract interpretation; and (4) ignoring evidence of a disputed question of material fact concerning Pepperidge Farm's ability to comply with its customers' requests to deliver product to companies like Eby-Brown.

We begin by noting that each of Pepperidge Farm's arguments was or could have been argued in the prior motions for summary judgment. Further, no argument advanced here is based on any controlling legal precedent which was totally disregarded and/or misapplied by the Court. Instead, Pepperidge Farm's arguments once again challenge the reasoning employed by the Court as set forth in its August 30, 2010 Order. Such a "second bite at the apple" provides convincing proof of the adage that "the bane of lawyers is prolixity and duplication . . . ." *Ryan v. Commodity Futures Trading Com'n,* 125 F.3d 1062, 1064 (7th Cir. 1997).

Pepperidge Farm's request for reconsideration [318] is hereby **denied,** for the reasons explicated in detail below and in our prior ruling on the cross-motions for summary judgment; no persuasive basis has been shown in the pending motion for reconsidering that decision. The

record in this case is more than sufficient, thus a hearing and oral argument are unnecessary, and Pepperidge Farm's request for such [321] is **denied.**

### I. Ambiguities Created by Paragraph 9 of Consignment Agreement

Pepperidge Farm contends, first, that the Court improperly construed ambiguities in the contract between the parties against Pepperidge Farm as the drafter of the contract without resort to extrinsic evidence. The principle that ambiguities are to be construed against the drafter without resort to extrinsic evidence (most commonly applied in insurance contracts) was properly applied here in the Court's interpretation of a single provision, specifically paragraph 9, of the Consignment Agreement vis-a-vis the Pallet Addendum and the Indiana Disclosure Statement. See *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1,* 572 F.3d 353, 361 (7th Cir. 2009) ("Indiana arguably applies the rule of construing ambiguities against the drafter more liberally, and the Indiana Supreme Court has occasionally applied the rule without considering whether extrinsic evidence would clarify the parties' intent." *Id.* (citing cases)); *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009) (stating that insurance contracts are governed by the same rules of construction as other contracts); *Fresh Cut, Inc. v. Fazli,* 650 N.E.2d 1126, 1132 (Ind.1995) (stating that the lease was drafted by owner, and an ambiguous contract will be construed against its drafter). We held that all of the other agreement's terms that were in controversy or otherwise relevant were not ambiguous.

The ambiguity is whether Pepperidge Farm agreed to pay the Plaintiff's commissions on shipments "in palletized form" to customer warehouses or cross-docking facilities. Pepperidge Farm argues that, pursuant to paragraph 9 of the Consignment Agreement, it is permitted to make warehouse deliveries for its "own account," while Plaintiff's argue that per the Pallet Addendum Pepperidge Farm promised to pay such commissions to them, or in the case of Jenay Craig per the Indiana Disclosure Statement.

3

We held that it was appropriate to construe any ambiguity created by paragraph 9 against the drafter, Pepperidge Farm. As illustrated below, paragraph 9 is one of several provisions which together comprise a form contract; the Pallet Addendum is a separate document which specifically addresses the Plaintiffs' rights to be paid commissions for the products delivered by Pepperidge Farm directly to customers through their warehouses or cross-docking facilities rather than through direct store delivery ("DSD") to their retail premises. The Pallet Addendum acknowledges that its terms supplement Pepperidge Farm's rights under paragraph 9. Each of these documents was drafted by Pepperidge Farm and were executed by each of the parties at the same time.

> **Paragraph 9 of the Consignment Agreement provides**:
>
> > **PROHIBITED SALES AND DELIVERIES.** Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Product to any Chain[1] via a central or district warehouse or in any manner other than directly to its retail stores. **If despite the best efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such Chain for its own account via such warehouse deliveries, as long as such refusal remains in effect.** In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period of time set forth in such written request distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

See dkt. 303-1 at p. 4 (emphasis added).

---

[1] "Chain" is defined as "any person, firm, corporation or other legal entity that owns or operates three or more retail stores."

The Pallet Addendum states:

> I understand that from time to time Pepperidge Farm may be requested to deliver Consigned Products to customers in palletized form through their warehouses and/or cross-docking facilities. I hereby request that Pepperidge Farm effect such cross-dock/warehouse delivery to these customers for my account pursuant to the Pallet Delivery Program and to comply with its terms. I understand and agree that, under such Pallet Delivery program **Pepperidge Farm (i) may, at its option, deliver Consigned Products to a customer's warehouse and/or cross-docking facility for delivery to retail stores in my territory and (ii) shall pay me an amount equal to the commissions for the Consigned Products so delivered to retail stores in my territory** computed at the rate specified in Schedule B of my Consignment Agreement, less an amount to cover a portion of the costs incurred in connection with such Pallet Delivery Program and the delivery of products thereunder. Until further notice, the amount of that deduction shall not exceed $30 per pallet.
>
> I agree that once such Consigned Products are so delivered to any retail store in my territory, I will, when requested, provide service to those stores for such products as though they had been delivered by me under the terms of the Consignment Agreement.
>
> I acknowledge and agree that Pepperidge Farm may at any time modify, change or terminate the Pallet Delivery Program and/or the amounts paid thereunder, but I request 30 days' notice of any such change. I further acknowledge and agree that the rights set forth in this letter are in addition to, and not in lieu of, any other rights or obligations contained in the Consignment Agreement, including, without limitation, the rights of Pepperidge Farm under the terms of Section 9 of that Agreement.

Dkt. 303-1 at p. 21 (emphasis added).

Paragraph 9 of the Indiana Disclosure Statement states:

> Where the Consigned Products are not delivered to a store by the distributor but instead are palletized and delivered, under Bakery's pallet delivery or surge volume programs, either directly by Bakery or indirectly by Bakery through the customer's cross dock or warehouse facilities, **the distributor receives full commission on the sale of the Consigned Products delivered to the retail store in his/her Territory** but must reimburse Bakery for a portion of the costs incurred by Bakery in effecting such distribution.

Dkt. 303, Pl.'s Ex. K. ¶9 (emphasis added).

The Pallet Addendum and relevant portion of the Indiana Disclosure Statement both provide clear evidence of the parties' understanding that Plaintiffs would be paid a commission for the product Pepperidge Farm delivered to a customer's warehouse which was later delivered to a retail store in his or her territory. This promise is expressed in mandatory language, using the words "shall pay" in the Pallet Addendum and "receives full commission" in the Indiana Disclosure Statement. The consideration for this promise was the Consignment Agreement itself.

Paragraph 9 read in isolation appears to support Pepperidge Farm's position, but when considered in the context of the parties' entire agreement Plaintiffs' proffered construction is confirmed: that is, that Pepperidge Farm breached the Plaintiffs' Consignment Agreements when it failed to pay commissions on products delivered by pallet to a customer's warehouse and subsequently delivered (by any means) to stores in the Plaintiffs' territories. The Pallet Addendum not only can not be ignored, we view its language to be controlling. *See MPACT Const. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 908 (Ind. 2004); *Allied Structural Steel Co. v. State*, 148 Ind.App. 283, 288, 265 N.E.2d 49, 52 (1970) ("The true meaning of a contract is to be ascertained from a consideration of all its provisions, and a liberal or technical construction of an isolated clause should not be indulged to defeat the true meaning."); *Gen. Ins. Co. of Am. v. Hutchison*, 143 Ind.App. 250, 254, 239 N.E.2d 596, 598-99 (1968) ("It is the general rule of law in our State that words, phrases, sentences, paragraphs and sections of a contract cannot be read alone.").

Unlike the situation in *MPACT*, where the Indiana Supreme Court held that there was no meeting of the minds between the parties on the issue in dispute, there is no basis on which to accept Pepperidge Farm's contention here that at the time the agreements were entered into with

Plaintiffs, Pepperidge Farm believed it was not required to pay commissions on products delivered by pallet to a customer's warehouse and subsequently delivered by any means to stores in Plaintiffs' territories. "Where a contract is ambiguous it will be construed most strongly against the party preparing it or employing the words concerning which doubt arises, the reason for the rule being that a man is responsible for ambiguities in his own expressions and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court will adopt * * * another thing more to his advantage." *Smith v. Sparks Milling Co.,* 219 Ind. 576, 603, 39 N.E.2d 125, 135 (Ind. 1942) (internal citation omitted).

The Court's previous rulings with regard to the proper interpretation and effect of any contractual ambiguities stand.

## II. Plaintiff's Intentions at the Time of Contract Formation

Pepperidge Farm's second claim of error is that the court erroneously interpreted the relevant agreements in a manner inconsistent with Plaintiffs' own conduct, failing to consider evidence of Plaintiffs' intentions in entering into these agreements and their own subsequent interpretations of them. In support of this argument, Pepperidge Farm provides two examples: First, Pepperidge Farm points to Plaintiffs' claim against Pepperidge Farm that it did not use its best efforts to obtain permission from the retailers for DSD. Pepperidge Farm maintains that–

> If plaintiffs truly believed that Pepperidge Farm was required to pay them commissions under Paragraph 9 irrespective of whether plaintiffs delivered the product, there would be no reason for plaintiffs to argue that Pepperidge Farm did not use its best efforts to preserve direct store delivery. Nor would there be any reason to have this provision in the contract. Plaintiffs would want Pepperidge Farm not to use its best – or any efforts – to maintain DSD, because then plaintiffs would get their 20% commission without expense or effort.

In response, Plaintiffs argue that these statements excerpted from the briefing in response to Pepperidge Farm's original motion for summary judgment shed no light on the parties'

7

intentions at the time of contract formation. As a practical matter, these pro se Plaintiffs were at the time simply responding to Pepperidge Farm's claims and, in any event, they had every right to offer alternative arguments. Plaintiffs contend that "[t]here was nothing inconsistent in their believing that Pepperidge Farm did not have the right to use independent wholesalers, except as specifically provided in the provisions for a failure to serve or termination for cause, and also arguing that Pepperidge Farm had not used its best efforts to keep direct store deliveries." We agree with Plaintiffs that it would be inappropriate to draw inferences about the parties' intentions based on summary judgment briefing. Plaintiffs' contention that Pepperidge Farm did not use its best efforts to preserve direct store delivery is not inherently inconsistent with their claim that Pepperidge Farm did not have the right to use independent wholesalers to distribute Pepperidge Farm products in their exclusive sales territory. We accept Plaintiffs' alternative theories as a legitimate strategy in litigating their claims in this regard.

Second, Pepperidge Farm contends that evidence would show that, when each Plaintiff purchased his or her route, the calculation of the value of the route included only retail stores the selling distributor was currently servicing, and did not include hypothetical values from retail stores that were not being serviced at all. Thus, Pepperidge Farm contends that, if the Plaintiffs expected to receive commissions on deliveries to all retail stores in their territories regardless of service, such stores would necessarily have been included in the calculation of the value of the route. In response, Plaintiffs argue that of primary importance in their agreements was Pepperidge Farm's grant of exclusive distributorships and the detailed descriptions and maps of each territory encompassed by an exclusive distributorship. To support an inference from the route calculations that the parties were only bargaining over the servicing rights to a predefined

8

number of stores the court would have to disregard the plain meaning of the agreements in favor of extrinsic evidence that Pepperidge Farm has belatedly adduced as evidence of the parties' contractual intentions. Plaintiff's argue that such a reliance on extrinsic evidence would be improper.

We agree with Plaintiffs that the evidence regarding the route value calculations constitutes extrinsic evidence which the Court properly disregards in giving effect to the parties' intentions as expressed in their agreements. *INB Banking Co. v. Opportunity Options, Inc*., 598 N.E.2d 580, 582 (Ind. Ct. App. 1992) ("'In interpreting a written contract the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties.'" *Id.* (quoting *First Federal Savings Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind. 1990))); *Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Bank. Co.*, 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992) (The first step in discovering intent is to gather meaning from the "four corners" of the written document.). Further, the evidence that Plaintiffs purchased exclusive distributorships is not disputed. However, inferring that the route value calculations were based only on the right to service a predefined number of stores appears inconsistent with the agreement as well as other evidence relating to the parties' intentions. The route value calculations were based on snapshots in time of that data. The value of an individual distributor's territory could increase as new stores were added and similarly could decrease if and as stores closed. The value of the route could increase as well if sales of Pepperidge Farm products grew. Specifically, the Indiana Disclosure Statement provided by Pepperidge Farm as entered into by Jenay Craig provides:

> There is no standard purchase price for a distributorship of this sort. The purchase price is not the same in all cases and is not generally determined with reference to any particular formula or method. However, the purchase price for distributorships similar to this distributorship is often established by multiplying the net wholesale dollar value of the average weekly sales of Consigned Products (as such term is defined in the Consignment Agreement) to retail stores in the territory described in the Consignment Agreement (the "Territory") for the preceding 52-week period by a sales multiple negotiated by the seller and buyer. Such sales multiple is not the same for all distributorships but varies from time to time and place to place and it also varies depending on the type of product involved. Some of the factors that may affect the sales multiple, and hence the purchase price, include interest rates, the state of the economy, the size and population density of the Territory covered by the distributorship, the strength of the Bakery's trademarks within such Territory, the type of product covered by the Consignment Agreement, the demographics of population and the number of existing or prospective customers within such Territory.

See dkt 169-1, page 26 of 59. This part of the Indiana Disclosure Statement leaves little doubt that the value of a route was not set in stone in a once-and-for-all fashion, but that values were expected to fluctuate depending on a variety of factors, including the number of prospective customers. It also was not permanently tied to a particular number of stores existing at the time of the sale. We therefore reject as unsubstantiated by the clear terms of these agreements Pepperidge Farm's claim that the value of a route at the time of the sale provides proof that the distributors intended to earn commissions only from the stores serviced at that time. The Court's failure to specifically reject these arguments, presented here for the first time in this motion to reconsider, did not arise from a manifest error of law.

### III. Principles of Contract Interpretation

Pepperidge Farm's third claim of error is that the court interpreted the relevant agreements in a manner that conflicts with other provisions of the Consignment Agreement,

thereby (again) violating principles of contract interpretation. Upon review, we again conclude that our prior interpretation of the relevant portions of the agreement effectively harmonizes the constituent provisions of the agreement and, in any event, disagreement with the Court's legal analysis (as opposed to the Court's manifest error) is not a proper basis on which to seek reconsideration. Nonetheless, for clarity and for emphasis, we shall briefly address these additional challenges to our August 30, 2010 Order.

As explained in that Order, we ruled that Pepperidge Farm breached the Plaintiffs' agreements when it failed to pay commissions on products delivered by Pepperidge Farm by pallet to a customer's warehouse or to an independent wholesaler which were subsequently delivered by any means to stores in the Plaintiffs' territories. Pepperidge Farm raises four objections to this holding: first, that it conflicts directly with the plain language of Paragraphs 3(b) and 4 of the Consignment Agreement and renders Paragraphs 3(b) and 4 meaningless;[2] second, that it fails to give effect to all words and phrases in the Indiana Disclosure Statement; third, that it produces a result that does not make economic sense; and fourth, that it renders Paragraph 7 of the Consignment Agreement meaningless. Each objection is addressed in turn below.

**A.**

First, we do not view our prior holding to conflict with the plain language of Paragraphs 3(b), and 4 of the Consignment Agreement nor does it render those paragraphs meaningless. First, Paragraph 3(b) provides that Plaintiffs shall receive commissions for their "services of solicitation and delivery" of Consigned Product. Pepperidge Farm asserts that this provision

---

[2] Pepperidge Farm also contends that Paragraph 9 is rendered meaningless. We have addressed that provision above and will not consider it further.

11

limits the Plaintiffs' right to receive commissions only on product which they have personally solicited and delivered to the customer. As to Paragraph 4, it provides that Plaintiffs "will use [their] best efforts to realize the full sales potential of [their Territories by] actively solicit[ing] all retail stores in [their Territories] whose accounts can be profitably handled, . . . ." Thus, according to Pepperidge Farm allowing the distributors to receive commissions under the Pallet Addendum even if they do nothing conflicts with their obligation under Paragraph 4 to use their best efforts to actively solicit retail stores.

We construe Paragraphs 3(b) and 4 to apply generally: to wit, Pepperidge Farm says to its distributors "use your best efforts and you'll be paid commissions." The Pallet Addendum and Indiana Disclosure Statement address the specific situation when the shipment of product is made to a customer's warehouse. The plain language of the Pallet Addendum contains the company's express promise to pay commissions, less shipment fees, to the distributors who are required to service the product only when specifically enlisted. Applying the well-settled principle of contract interpretation that specific terms control over general terms, *Burkhart Adver., Inc. v. City of Fort Wayne,* 918 N.E.2d 628, 634 (Ind. Ct. App. 2009), we interpret Paragraphs 3(b) and 4's general statement of the obligations and entitlements of the consignees to retain their meaning and substance, both separately and when considered in light of other more specific provisions.

**B.**

Pepperidge Farm further asserts that the Court erroneously concluded that the Pallet Addendum and the Indiana Disclosure Statement are not limited to temporary sales programs and that that interpretation does not give effect to all words and phrases in the Indiana Disclosure Statement. It is unclear what words or phrases Pepperidge Farm suggests have not been given

12

proper effect, but in any event we find no conflict between our ruling in this regard and the language in the Pallet Addendum or Indiana Disclosure Statement. Nothing in that ruling would preclude Pepperidge Farm from seeking set-offs for shipment charges as contractually allowed by the Pallet Addendum.

Neither the Pallet Addendum nor the Indiana Disclosure Statement uses words relating to a "temporary sales program," and the Court in construing these documents neither created such a limitation, nor recognized one.

## C.

Pepperidge Farm takes further issue with the Court's interpretation of the Pallet Addendum and Indiana Disclosure Statement claiming it produces a result that makes no economic sense by granting Plaintiffs an entitlement to commissions on Consigned Product which they neither delivered nor serviced, and also provides a disincentive to Plaintiffs to obtain and preserve DSD. In effect, Pepperidge Farm argues, the Court's interpretation allows the Plaintiffs to receive payment for work that Pepperidge Farm itself performed and to which Plaintiffs made no contribution. *See Beanstalk Group, Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) ("[A] contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek."); *Hartford Fire Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 280 F.3d 744, 747 (7th Cir. 2002); *BKCAP*, 572 F.3d at 360.

But, as Plaintiffs note, Pepperidge Farm's arguments focus on contrived outcomes of the parties' agreement rather than their initial intentions in entering into it. The starting point for all contractual interpretation is to attempt to determine the parties' intentions at the time of formation of their agreement. Plaintiffs argue that *"Beanstalk* does not instruct courts to interpret

13

contracts in the way that makes most economic sense to the courts. That would be license for reformation."

Again, we remain unpersuaded by Pepperidge Farm's arguments. As Plaintiffs note, the holding in *Beanstalk* reflects the common sense principle that, in attempting to divine the parties' intentions, a court can (and should) presume the parties were acting with economic sensibility, and that means their understandings at the time they formed their agreement. *Beanstalk*'s "economic sense" principle provides no guarantee against parties making a bad bargain. It simply provides a helpful tool for analyzing the parties' intentions at the time their agreements were formed. The Pallet Addendum and Indiana Disclosure Statement formed a portion of the overall promises Pepperidge Farm made in exchange for the Plaintiffs' agreement to purchase an exclusive Pepperidge Farm distributorship. It was far from a "something-for-nothing" exchange.

**D.**

Nor does the Court's interpretation of the agreement as spelled out in our prior ruling render Paragraph 7 meaningless. Paragraph 7 of the Consignment Agreement provides:

> **FAILURE TO SERVICE PARTICULAR STORES.** If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

Pepperidge Farm asserts that paragraph 7 gives it the option to remove stores or segments

14

of stores from Plaintiffs' exclusive distribution territory without compensation where the distributor never provided service to the store, regardless of whether that store was willing to accept DSD in the first place.

Pepperidge Farm's interpretation of paragraph 7 was rejected in our prior Order by our holding that Pepperidge Farm is entitled to invoke this provision when a distributor refuses to "provide" – meaning "to supply," Oxford English Dictionary (3rd ed. 2007) or "maintain" – meaning "to continue," Black's Law Dictionary (9th Ed. 2009) – satisfactory distribution service to an existing customer. Further, under paragraph 7, if a distributor refuses to provide service to a store or group of stores that had agreed to accept Pepperidge Farm products via DSD, Pepperidge Farm would be entitled, by following the steps laid out in paragraph 7, to remove the store or group of stores from the distributor's territory. Thereafter, the distributor would receive no commissions for deliveries to those stores, how ever those deliveries were made. Paragraph 7 applies to the servicing of stores, not the solicitation of sales, which is addressed by other provisions in the agreement, such as paragraph 4, which obligates the Plaintiffs to "actively solicit all retail stores in the Territory who accounts can be profitably handled."[3]

To accept Pepperidge Farm's interpretation of paragraph 7 would require that Plaintiffs, whose contracts granted them the exclusive rights to distribute Pepperidge Farm products, could have whole segments of their territory withdrawn without receiving any compensation through no fault of their own. Pepperidge Farm's interpretation is particularly troubling given the fact that the record reflects that, even when Pepperidge Farm and Plaintiffs employ their "best

---

[3] Plaintiffs clearly have an incentive to use their best efforts to encourage and solicit DSD, because, if Pepperidge Farm determines that any Plaintiff is not using his/her best efforts, that distributorship agreement could be cancelled. See, for example, paragraphs 19 and 23 of the Consignment Agreement.

efforts" in soliciting new customers, such solicitations may ultimately be unsuccessful and customers may decline DSD. The record reflects that customers typically decline DSD in favor of warehouse or delivery by a third party distributor, such as Eby-Brown, for a variety of reasons, including: (1) to achieve uniform service levels; (2) to eliminate problems associated with non-existent, poor, or infrequent delivery service; (3) to avoid having chain store customers compete with delivery trucks for parking spaces; and/or (4) to achieve efficiencies and synergies within a supply chain that are not present in a DSD system. See, for example, dkt. 170-1 (page 31, Hudson Group states that, because of security restrictions, DSD is not permitted) (pages 32-33, SSA including Rich Oil, Speedway, and SuperAmerica Stores require delivery from Eby Brown for consistency) (pages 34-37, Toys R Us and Babies R Us stores will not accept DSD from food companies and instead require warehouse deliveries). We shall not adopt an interpretation which not only distorts the operative contractual language, but would result in a plainly harsh and unjust result.

## IV. Breach in Favor of a Third Party

Pepperidge Farm's fourth and final claim of error is that the court ignored evidence of a disputed question of material fact concerning Pepperidge Farm's ability to comply with its customers' requests to deliver product to companies like Eby-Brown. But no rule of contract interpretation requires or permits reformation of a contract to satisfy the demands of third parties such as Pepperidge Farm customers. The evidence adduced suggests that Pepperidge Farm chose to breach the consignment agreements it had with Plaintiffs in order to satisfy certain of its customers' demands, and, based on that finding of a unilateral breach, we have previously ruled that Pepperidge Farm must compensate Plaintiffs by paying them damages.

To the extent Pepperidge Farm now disputes the Court's finding that Eby-Brown is not an out-sourced warehouse of Pepperidge Farm's customers, that contention is unavailing. The evidence Pepperidge Farm adduced on that point, specifically Speedway's request that shipments be made through Eby-Brown (see dkt. 308, exhibits 816 and 817) and the general declaration that Eby-Brown offers companies an opportunity to out-source their warehouse needs (dkt. 309, exhibit 5, Scardina Decl. ¶¶ 5, 6), did not create a triable issue of fact when considered in light of the other evidence of record. Nothing cited here by Pepperidge Farm warrants reconsideration or reversal of our prior ruling.

## V. Liability Has Been Established

One more issue deserves our attention in ruling on the pending motion. Pepperidge Farm implies that the issue of liability has not been proven by Plaintiffs. However, as the Court has previously ruled, Plaintiffs are entitled to summary judgment on their breach of contract claim, leaving the issue of damages as the sole remaining matter for the jury to decide. Under Indiana law, the controlling essential legal elements of a breach of contract action are beyond controversy: Plaintiffs must prove the existence of a contract, the defendant's breach thereof, and damages. *U.S. Valves, Inc. v. Dray*, 190 F.3d 811, 814 (7th Cir. 1999) (*citing Fowler v. Campbell*, 612 N.E.2d 596, 600 (Ind.Ct.App.1993)); *Wal-Mart Stores, Inc. v. S.C. Nestel, Inc.* 2010 WL 2267751, at * 9 (S.D. Ind. 2010); *W.S.K. v. M.H.S.B.*, 922 N.E.2d 671, 694 (Ind. Ct. App. 2010); *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind. Ct. App. 2009); *Gatto v. St. Richard Sch., Inc., et al.*, 774 N.E.2d 914 (Ind. Ct. App. 2002); *Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind. Ct . App. 1998).  The first two of these elements, as we have found, have been established as a matter of law in Plaintiff's favor.

17

Under well-established prevailing precedent, the measure of damages for breach of contract is the loss actually suffered by the breach. *Sheppard v. Stanich*, 749 N .E.2d 609, 611 (Ind. Ct. App. 2001). Presumably, Plaintiffs' damages include any amount attributable to unpaid commissions. Whatever their specific theory of entitlement to damages, however, Plaintiffs must convince the jury by a preponderance of the evidence that such damages flow "directly and naturally from the breach." *Sammons Commc'ns of Indiana, Inc. v. Larco Cable Constr.*, 691 N .E.2d 496, 498 (Ind. Ct. App. 1998). We expect Pepperidge Farm to assert a vigorous defense against these claims, as it has done each step of the way during this protracted litigation.

After nearly five years of extensive motions practice, the issue of liability has (finally) been resolved (in Plaintiffs' favor). The only issue remaining is the extent of damages to which Plaintiffs are entitled to compensate them for any injuries shown to have flowed from Pepperidge Farm's breach of contract.

The Defendant's motion to reconsider is **DENIED** in all respects.

**IT IS SO ORDERED.**

Date: 04/27/2011

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Susanne Noyes Geraghty
GOODWIN PROCTER LLP
sgeraghty@goodwinprocter.com

Forrest A. Hainline III
GOODWIN PROCTER LLP
fhainline@goodwinprocter.com

William M. Horne
HORNE LAW LLC
hornelaw@comcast.net

Julianna Marie Plawecki
ICE MILLER LLP
julianna.plawecki@icemiller.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com